# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-08-00455-CR

---

**Dominick David Deaton, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE DISTRICT COURT OF BELL COUNTY, 27TH JUDICIAL DISTRICT
NO. 61201, HONORABLE JOE CARROLL, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

A jury convicted Dominick David Deaton of the offense of aggravated sexual assault. *See* Tex. Penal Code Ann. § 22.021 (West Supp. 2008). Punishment was assessed at 45 years' imprisonment and a $10,000 fine. In two issues on appeal, Deaton challenges the factual sufficiency of the evidence and asserts that the district court committed charge error during punishment. We will affirm the judgment.

## BACKGROUND

The complainant in this case was A.D., Deaton's seven-year-old daughter. At trial, Deaton's wife Raina[1] testified that on the morning of July 20, 2006, as she was preparing to wake their two children, she noticed that A.D.'s door was closed. Raina explained that this was "unusual,"

---

[1] Because Deaton and his wife share a common surname, we will refer to Raina by her first name.

because A.D. "never slept with her door closed." Raina also noticed that she did not see Deaton in their computer room, where she had expected him to be. Raina "got a sick feeling in [her] stomach" and opened the door to A.D.'s bedroom. According to Raina, when she opened the door, "I saw him [Deaton] kneeling by her bed, or sitting on it, and he was hugging her, and she was naked." Raina testified that A.D. "ran straight for the closet" and closed the door. Raina recalled that Deaton, who was dressed in a t-shirt and shorts, walked out of the room, got dressed, and went to work.

After Deaton had left the house, Raina called A.D. into the living room and asked her what had happened. Raina testified that A.D. told her, "Nothing," and ran into her room crying. Raina followed A.D. into her room and asked her what was wrong. According to Raina, A.D. said, "It is a secret." Raina responded, "What's a secret? You can tell me. You're not going to get in trouble." Then, Raina recalled, A.D. told her "that daddy had touched her private parts." Raina testified that she also began to cry as she attempted to comfort her daughter and further inquire about what had happened that morning and whether anything similar had happened in the past. According to Raina, A.D. told her that "[i]t wasn't the first time." The two continued talking for "maybe five or ten minutes," but Raina was not able to elicit any additional information from A.D. Raina then told A.D. to watch cartoons with her brother, while Raina considered how to respond.

Raina decided to call Deaton and confront him with A.D.'s accusations. Raina testified that when she talked to him, Deaton denied touching A.D., telling Raina, "Why would she say that? She's making up a story." When she had finished talking to Deaton, Raina again asked A.D. what had happened, this time telling her, "I want to make sure that you are telling me the truth.

2

If you are not telling me the truth, tell me now." According to Raina, A.D. maintained that Deaton "touched her private parts."

Raina then took A.D. and A.D.'s brother to day care, returned home, and eventually went to Temple College, where she was taking classes at the time. While she was at the college, Raina testified, Deaton called her and again denied the accusations. According to Raina, Deaton kept saying, "We need to sit her down and talk to her." Raina, however, did not "want him talking to her." She explained, "I was scared if he was talking to her, that she would be scared and wouldn't tell the truth."

Raina decided to return home. She claimed that she was "crying so hard" that she eventually fell asleep. When Raina awoke, "maybe about an hour" later, Deaton called and informed her that he was coming home to talk to her about A.D.'s accusations. Raina testified that when Deaton arrived, he repeated his denial and again stated, "We need to talk with her. We need to sit her down." After their conversation, Raina explained, Deaton "angrily" went to the computer room while she cried and "eventually fell asleep again."

Later that day, Raina decided to pick up the children from day care. After doing so, she dropped off A.D.'s brother at home and drove A.D. to a middle school parking lot. There, Raina testified, she told A.D., "I'm sorry I keep asking these same questions, but I need to know what happened that morning. If you're lying, if you're making up the story, now is the time to tell the truth. You won't be in trouble, but that I need to know." According to Raina, A.D. told her "that Daddy had used his tongue on her." Raina recalled, "As soon as she said that he used his tongue on her, I knew it wasn't no misunderstanding, no story." When asked how she knew this, Raina

3

testified, "Why would a little girl know about using a tongue in a private? You can't. That's not a misunderstanding. That's not an accidental touch. . . ."

Raina returned home, picked up A.D.'s brother, and drove to the Bell County Sheriff's Office. There, Raina filed a report and was directed to Scott & White Hospital, where A.D. was examined by a sexual assault nurse examiner ("SANE nurse"). Raina testified that the SANE nurse performed a physical exam and interviewed A.D. while Raina was not present.

Lori Talbot, the SANE nurse who had examined A.D., testified about the results of the physical exam and what A.D. had told her during the interview. Talbot testified that A.D. "was cooperative" and "talked easily to me, told me what happened." At the time of the examination, Talbot prepared a report of her findings. The report was admitted into evidence as State's Exhibit 5. Talbot read for the jury a portion of the report in which she had documented what A.D. had told her. Talbot testified, "I have documented, 'Patient states: This morning Dad was touching my private—she points to the female sexual organ—with his tongue. I was in my room laying on my bed. I was asleep. My mom came in. Dad said it was top secret. . . .'" As for the physical exam, Talbot testified that she did not find any obvious areas of injury to A.D. When asked if this finding was unusual based on what A.D. had told her, Talbot testified, "No, that is what I expected." On cross, Talbot agreed that if she had not interviewed A.D., she would not have known from the physical exam that anything had happened to A.D.

Talbot's report was reviewed by Dr. Pamela Green, the director of Scott & White's Sexual Assault Program. Dr. Green explained that even when penetration has occurred, "it's very common" for children to have "normal" physical exams, based on the manner in which perpetrators

4

usually assault children. Green also testified, "[Y]ou wouldn't expect to see trauma from oral activity." On cross, Green was asked, "If you delete or leave out the history that was given from the child, there is absolutely nothing in the report to show any kind of sexual contact took place, correct?" Green answered, "If you were to leave out the history, then that's true."

Raina and the children left the hospital later that night and returned home. Deaton was not there.[2] The next day, Investigator Aaron Ingram of the Bell County Sheriff's Office called and asked Raina to return to the sheriff's office to provide a statement. After giving her statement, Raina took the children to the Children's Advocacy Center, where A.D. was again interviewed without her mother being present. The interview was recorded via video camera while Ingram monitored the interview from another room.

Raina testified that Ingram called a couple of days later and told her that "he wanted to talk about something that came up on the interview." When Ingram arrived at the house, he asked Raina about "some lotion." Raina believed Ingram was talking about a "lubricating lotion" that she and Deaton had used in the past. Raina showed Ingram where the lotion was located—"in my night stand, kind of underneath some clothes." Raina explained that at the time she showed Ingram the lotion, A.D. was out of the house spending time with Raina's mother. According to Raina, when A.D. returned home, A.D. talked to Ingram and then walked into Raina's bedroom, "went straight to the lotion and picked it up and said, 'This is it,'" and handed the lotion to Ingram. The lotion was admitted into evidence as State's Exhibit 4.

---

[2] Deaton worked for the military. Raina testified that while they were at Scott & White, CPS had gone to their house and "called [Deaton's] commander to make sure that he was out of the house so we could go home."

A.D. also testified. According to A.D., Deaton came into her room, took off all of her clothes, and "start[ed] putting his tongue in my private." A.D. also testified to other incidents when Deaton put "his finger in my private" and "his private in my private."[3] Admitted into evidence during A.D.'s testimony were State's Exhibit 1, a diagram of a female body, and State's Exhibit 2, a diagram of a male body. The diagrams were used by the Children's Advocacy Center during A.D.'s interview to assist A.D. in describing what Deaton did to her. A.D. recognized the diagrams and testified about the words she had used to identify the body parts in the diagram. Also admitted into evidence during A.D.'s testimony was State's Exhibit 3, A.D.'s drawing of a male sexual organ, also obtained during her interview at the Children's Advocacy Center. A.D. identified what she had drawn as "my dad's private." When asked if she drew this because she had seen "his private," A.D. testified, "Yes." When asked if she had ever seen any other boy's or man's "private" before, A.D. testified, "No." On cross, defense counsel elicited testimony that, when A.D. was three or four years old, she took baths with her younger brother, apparently suggesting that A.D. may have previously seen her brother's sexual organ. However, on redirect, when asked if the sexual organ she drew belonged to her brother, A.D. testified, "No." A.D. repeated that the sexual organ was "[m]y dad's." A.D. also testified about the "smoother cream" that Deaton would sometimes use on her. However, A.D. was unable to specifically identify State's Exhibit 4 as the lotion that was used.

---

[3] The jury was instructed that evidence of these other incidents was admitted "to show, if it does, the state of mind of the defendant and the child or the previous and subsequent relationship between the defendant and the child."

6

The only witness to testify for the defense was Deaton. Deaton testified that, on the morning of the alleged assault, he was running late for work and went into A.D.'s room "yelling" at her to wake her up. He explained, "I shook her on the shoulder, told her she needed to get up and in the shower now. It was her turn to take a shower that morning." When asked what he did about getting A.D. in the shower, Deaton testified as follows:

> Well, I got her up, sat her up, she threw a fit and threw herself back down on the bed. I swatted her on the butt, told her she needed to get up and get dressed—I mean, get up and get in the shower. She started crying because, you know, when you get up somebody is yelling at you, you're going to cry.

> Then I told her—she was having a fit, so after I swatted her on the butt, she wasn't moving. You know, she got into even more throwing a fit, crying. So then I undressed her. I told her she needed to get in the shower and get her show now [sic]. I undressed her, told her to go get a robe and get in the shower.

Deaton claimed that after A.D. "threw a fit," he tried to explain to her that he was going to be late for work and that was why he was upset and wanted her to hurry. "After I explained it to her," Deaton testified, "I gave her a hug and then told her to go get your robe and get in the shower." Then, Deaton recalled, Raina walked in the room. He testified that A.D. ran to the closet "to get her robe," while he started walking toward the door and told Raina, "[A.D.] is going to take her shower." Deaton denied touching A.D.'s private parts with his mouth or tongue, denied the other incidents to which A.D. had testified, and denied having any kind of sexual contact with her at any time.

On cross-examination, the State questioned Deaton extensively about inconsistencies between his and Raina's testimony. For example, Raina testified that the children always showered at night. Deaton, on the other hand, testified that "one [child] would take a shower at night and one

7

would take a shower in the morning." According to Deaton, that morning it was A.D.'s turn to take a shower. The State also inquired into whether Deaton had closed A.D.'s door that morning. Deaton claimed that A.D. had closed the door "after I took her top off." The State also elicited testimony that it was not Deaton's normal routine in the morning to undress his daughter and that the last time he had undressed her was "probably" when she was three or four years old. In its rebuttal, the State offered into evidence a written statement Deaton gave to the police during the investigation. Deaton's written statement was largely consistent with his trial testimony.

Deaton was charged with two counts of aggravated sexual assault of a child. However, prior to trial, the State abandoned the first count. The remaining count alleged that Deaton caused A.D.'s sexual organ to contact his mouth. The jury convicted Deaton as charged, and he was subsequently sentenced to 45 years' imprisonment. This appeal followed.

## ANALYSIS

**Factual sufficiency**

In his first issue, Deaton asserts that the evidence is factually insufficient to support the jury's finding of guilt.[4] According to Deaton, despite Raina's "sinister spin" on what she observed in A.D.'s bedroom, "it is common knowledge that it is not unnatural for a father to dress, undress, bathe and otherwise have such contact with prepubescent daughters." Deaton also claims that A.D.'s mother could have "plant[ed] the seed of sexual abuse where none had existed

---

[4] Deaton concedes in his brief that the evidence is legally sufficient. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (holding that evidence is legally sufficient when appellate court, after viewing evidence in light most favorable to judgment, determines that rational trier of fact could have found essential elements of offense beyond reasonable doubt).

previously" when she repeatedly spoke to her daughter about the incident. Additionally, Deaton places significance on the fact that the lotion seized by the police "was not identified by [A.D.] in court," and that "there was no medical evidence" to "corroborate that any penile or digital penetration of the sexual organ had occurred."

In a factual sufficiency review, we consider whether, after viewing the evidence in a neutral light, a rational trier of fact was justified in finding guilt beyond a reasonable doubt. *See Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006). We "must be cognizant of the fact that a jury has already passed on the facts and must give due deference to the determinations of the jury." *Lancon v. State*, 253 S.W.3d 699, 704-05 (Tex. Crim. App. 2008). "A verdict should be set aside only if the evidence supporting the verdict is so weak as to render the verdict clearly wrong or manifestly unjust." *Id*. at 705; *Korell v. State*, 253 S.W.3d 405, 412 (Tex. App.—Austin 2008, pet. ref'd). Therefore, we will not reverse a judgment on a factual sufficiency challenge unless we can say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the verdict. *Watson*, 204 S.W.3d at 417.

A person commits the offense of aggravated sexual assault of a child if he sexually assaults a child younger than 14 years of age. *Id*. § 22.021(a)(1), (2)(B). In this case, the district court instructed the jury that it would find Deaton guilty of the offense if it believed from the evidence beyond a reasonable doubt that Deaton intentionally or knowingly caused A.D.'s sexual organ to contact his mouth. *See id*. § 22.021(a)(1)(B)(iii).

9

The evidence supporting the jury's finding of guilt includes the following:

- A.D. testified that Deaton came into her room, took off all of her clothes, and "start[ed] putting his tongue in my private."

- Raina testified that A.D. told her that "that daddy had touched her private parts" and "that Daddy had used his tongue on her."

- The SANE nurse testified that A.D. told her, "This morning Dad was touching my private—she points to the female sexual organ—with his tongue. I was in my room laying on my bed. I was asleep. My mom came in. Dad said it was top secret. . . ." The report of the nurse's findings containing this information was also admitted into evidence.

- In diagrams used during A.D.'s interview at the Children's Advocacy Center, A.D. was able to describe the offense by identifying the male and female body parts that were involved in the offense, including Deaton's tongue. A.D. also drew a picture of a male sexual organ that she identified in court as belonging to her father.

The evidence contrary to the jury's finding consists of Deaton's testimony and written statement denying the accusations, the absence of medical evidence showing that penetration occurred, and the fact that A.D. was unable to identify in court the lotion that Deaton allegedly used on her during other incidents of sexual abuse.

The jury is the sole judge of the credibility of the witnesses and the weight to be given the evidence, and may choose to believe all, some, or none of it. *Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000); *Rachal v. State*, 917 S.W.2d 799, 805 (Tex. Crim. App. 1996); *Skillern v. State*, 890 S.W.2d 849, 879 (Tex. App.—Austin 1991, pet. ref'd). Thus, the jury is permitted to believe or disbelieve any part of the testimony of any witness. *Jones v. State*, 984 S.W.2d 254, 258 (Tex. Crim. App. 1998). We find nothing "manifestly unjust" about the jury choosing to believe A.D.'s testimony and disbelieve Deaton's testimony. While Deaton asserts that A.D.'s recollection

10

of what happened may have been influenced by her mother, it would not have been against the great weight and preponderance of the evidence for the jury to conclude otherwise. Raina testified that after A.D. told her what had happened, she confronted her daughter—twice—about whether she was telling the truth. Thus, the jury could have reasonably inferred that, rather than encouraging her daughter to make up a story, Raina was attempting to ensure that A.D. was not mistaken about what had happened to her. In fact, Raina testified that she did not want to believe the accusations against her husband, and only concluded for certain that A.D. was not mistaken when A.D. finally told her that Deaton had used his tongue on her. As Raina explained, "Why would a little girl know about using a tongue in a private? You can't. That's not a misunderstanding. That's not an accidental touch. . . ." Furthermore, the jury could have credited the fact that A.D. persisted in her outcry even after her mother confronted her about whether she was telling the truth. Additionally, even were the jury to discount Raina's testimony about what A.D. told her, the jury could still consider and credit the testimony of the SANE nurse who interviewed A.D. Raina was not present during this interview. Nor was Raina present during A.D.'s interview at the Children's Advocacy Center, where A.D. described the offense and identified male and female body parts on diagrams and drew a picture of a male sexual organ that she identified in court as belonging to her father. The jury could have credited the drawing and diagrams as additional evidence supporting A.D.'s testimony. On the other hand, Deaton's argument that he was innocently undressing his daughter in order to "get her into the shower" is contradicted by Raina's testimony that the children take showers at night, not in the morning. Moreover, the jury could have found that Deaton's own

11

admission that he had not undressed his daughter since she was three or four years old belied his claim that what he was doing to his daughter that morning was an innocent act.

As for the absence of medical evidence showing that penetration occurred, Dr. Green testified that, even when penetration has occurred, "it's very common" for children to have "normal" physical exams, based on the manner in which perpetrators usually assault children. Green also testified, "[Y]ou wouldn't expect to see trauma from oral activity." Thus, we find nothing "manifestly unjust" about the jury discounting the absence of medical evidence showing that penetration occurred and focusing instead on A.D.'s testimony and the testimony of those to whom A.D. reported the abuse.

Finally, while it is true that A.D. was not able to identify in court the lotion that was allegedly used on her, the jury could have found this fact to be of no consequence in its ultimate determination of whether Deaton assaulted A.D. as alleged. A.D. testified that Deaton did not use the lotion on her that morning but on other occasions. Raina and Ingram testified that A.D. was able to locate the lotion in the master bedroom when Ingram questioned her about it. Also, A.D. provided details about the lotion that Deaton allegedly used on her. She called it "some kind of smoother cream" and testified that Deaton told her why he was using it on her. A.D. further testified that she remembered where the lotion was kept: "In my mom's room in this little drawer beside her bed." Thus, despite A.D. not being able to identify the lotion in court, the jury could have credited A.D.'s other testimony about the lotion and inferred from this evidence that A.D. was telling the truth about what Deaton did to her.

Based on the above, we cannot say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts a finding by the jury that Deaton caused A.D.'s sexual organ to contact his mouth. We overrule Deaton's first issue.

***Allen* charge**

In his second issue, Deaton asserts that the district court erred in submitting an *Allen* charge to the jury without including language to the effect that any mistrial resulting from a deadlocked jury would be as to punishment only. In Deaton's view, "This misled the jury to believe that the individual they had found guilty of molesting his own daughter would be granted a new trial and released until tried again."

We review claims of jury charge error under the two-pronged test set out in *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *Swearingen v. State*, 270 S.W.3d 804, 808 (Tex. App.—Austin 2008, pet. ref'd). We first determine whether error exists. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005); *Swearingen*, 270 S.W.3d at 808. If error exists, we then evaluate the harm caused by the error. *Ngo*, 175 S.W.3d at 743; *Swearingen*, 270 S.W.3d at 808. The degree of harm required for reversal depends on whether that error was preserved in the trial court. When error is preserved in the trial court by timely objection, the record must show only "some harm." *Almanza*, 686 S.W.2d at 171; *Swearingen*, 270 S.W.3d at 808. By contrast, unobjected-to charge error requires reversal only if it resulted in "egregious harm." *See Neal v. State*, 256 S.W.3d 264, 278 (Tex. Crim. App. 2008).

An *Allen* charge is a supplemental charge sometimes given to a jury that declares itself deadlocked. *Barnett v. State*, 189 S.W.3d 272, 277 n.13 (Tex. Crim. App. 2006). It reminds

13

the jury that if it is unable to reach a verdict, a mistrial will result, the case will still be pending, and there is no guarantee that a second jury would find the issue any easier to resolve. *Id*. (citing *Allen v. United States*, 164 U.S. 492, 501 (1896)). While such a charge is permissible in both the federal system and Texas courts, trial courts must be careful to word it and administer it in a non-coercive manner. *Id*. "The primary inquiry to determine the propriety of an *Allen* charge is its coercive effect on juror deliberation, 'in its context and under all circumstances.'" *Howard v. State*, 941 S.W.2d 102, 123 (Tex. Crim. App. 1996) (quoting *Lowenfield v. Phelps*, 484 U.S. 231, 237 (1988)). An *Allen* charge is unduly coercive and therefore improper if it pressures jurors into reaching a particular verdict or improperly conveys the court's opinion of the case. *See Montoya v. State*, 810 S.W.2d 160, 166-67 (Tex. Crim. App. 1989); *West v. State*, 121 S.W.3d 95, 107-08 (Tex. App.—Fort Worth 2003, pet. ref'd) (citing *Arrevalo v. State*, 489 S.W.2d 569, 571 (Tex. Crim. App. 1973)).

The record reflects that, after the close of evidence on punishment, the jury began deliberating at 1:11 p.m. At 2:02 p.m., the district court received a note from the jury in which it asked four questions concerning probation.[5] At 2:12 p.m., the district court sent the jury its answers.

---

[5] The questions were:

1. Can an individual receive probation and prison years simultaneous? ex (8 yrs prison 10 yrs probation)

2. Will the time in prison be served whether complete or in part prior to probation?

3. What additional conditions can be added to probation? (other than listed)

4. Who determines additional conditions to probation?

At 2:37 p.m., the district court received a second note from the jury in which it asked three questions concerning sex offender rehabilitation.[6] At 2:50 p.m., the district court sent the jury its answers. Almost three hours later, at 5:43 p.m., the district court considered a third note from the jury in which the following question was asked: "What if the jury does not come to a unanimous decision?" In response, the district court proposed the following supplemental charge:

MEMBERS OF THE JURY:

Your foreman has asked the Court in writing what happens if this jury cannot reach a unanimous decision.
These additional instructions are given for your consideration in your further deliberations;
If this jury, after a reasonable length of time, finds itself unable to arrive at a unanimous verdict, it will be necessary for the Court to declare a mistrial and discharge the jury.
The indictment will still be pending, and it is reasonable to assume that the case will be tried again before another jury at some future time. Any such future jury will be impaneled in the same way this jury has been impaneled and will likely hear the same evidence which has been presented to this jury.
*The questions to be determined by that jury will be the same as the questions confronting you*, and there is no reason to hope that the next jury will find those questions any easier to decide than you have found them.
With this additional instruction, you are instructed to continue deliberations in an effort to arrive at a verdict which is acceptable to all members of the jury.

(Emphasis added). The following exchange ensued:

---

[6] The questions were:

1.      In prison will rehabilitation for sexual abuse be available?

2.      If yes, will this rehabilitation be required?

3.      With probation, will sex offender rehabilitation be required?

15

| | |
|---|---|
| [Defense counsel]: | Judge, I have no problem with it in theory. I just—This is not on guilt or innocence. This is on punishment, and this kind of makes it sound like you start the whole trial over again. I think they ought to be told that the punishment issues would have to be tried again because it's not a whole new trial. It would just be a trial on punishment. |
| The Court: | Questions to be determined by that jury will be the same questions confronting them, be punishment. |
| [Defense counsel]: | Up there under the first where it says, "If this jury, after a reasonable length [of] time, finds itself unable to arrive at a unanimous verdict, it will be necessary for the Court to declare a mistrial." And you might write in there, put "as to punishment," something like that so they will know it is not for the whole thing. |

. . . .

| | |
|---|---|
| [Prosecutor]: | Judge, I tend to agree with [defense counsel] that if we just add declare a mistrial as to punishment, discharge the jury, that that might be the safer thing to do. |
| [Defense counsel]: | And if you wanted to, at the bottom part, your Honor, I think that would be enough just to take care of it because that will let them know that it's as to punishment only. I just don't want to give them the wrong impression. |
| The Court: | (Indicating) Well, I'm not inclined to agree with either one of you. I like it the way it is, and I have used it the way it is. And if I write them a note and tell them I'll just declare a mistrial as to issues of punishment, I may create as much confusion as I clear up. . . . |
| | I think it's very clear to the jury in the last paragraph that the questions that would be determined by that jury will be the same questions that are confronting them. And that is, if they want to read that, is the issue of punishment. . . . |

. . . .

[Defense counsel]:   It should be— Let the jury know it is as to punishment only. But I have no problem with the Court sending that in without waiving the objection.

The district court overruled defense counsel's objection, stated that his objection was preserved, and sent the charge to the jury at 5:50 p.m. Almost two hours later, at 7:47 p.m., the jury returned with its verdict of 45 years' imprisonment and a fine of $10,000. Defense counsel requested that the jury be polled, and each of the twelve jurors stated that the verdict was his or hers.

On appeal, Deaton does not complain about any aspect of the supplemental charge other than the omission of language stating that the mistrial resulting from a deadlocked jury would be as to punishment only. We first observe that other language already in the charge addresses Deaton's concern. The last paragraph of the *Allen* charge instructed the jury that, in the case of a mistrial and the impaneling of a new jury, "[t]he questions to be determined by that jury will be the same as the questions confronting you." The only question confronting the jury was Deaton's punishment. The jury had already decided his guilt. This was expressly stated in the first paragraph of the district court's charge on punishment: "You have found the Defendant, Dominick David Deaton, guilty of the offense of Aggravated Sexual Assault, and it now becomes your duty to affix the punishment to be assessed him." There is nothing in the record to suggest that the jury disregarded or was confused by these instructions. *See Resendiz v. State*, 112 S.W.3d 541, 546 (Tex. Crim. App. 2003) (holding that appellate courts are to presume jury followed trial court's instructions absent evidence rebutting presumption); *see also Williams v. State*, 937 S.W.2d 479, 490 (Tex. Crim. App. 1996) ("[W]e assume that the jury would follow the instruction as given, and we will not reverse in the absence of evidence that the jury was actually confused by the charge.").

17

Moreover, including Deaton's proposed language in the charge could have discouraged the jury from further deliberations. The court of criminal appeals addressed a similar issue in *Howard v. State*, 941 S.W.2d 102 (Tex. Crim. App. 1996). In *Howard*, a capital murder case, the district court gave the jury an *Allen* charge after the jury indicated that it was deadlocked concerning the special punishment issues. *See id*. at 123. The charge did not inform the jurors that if they failed to reach agreement, the trial court would, as required by law, automatically impose a life sentence. *See* Tex. Code Crim. Proc. Ann. art. 37.071, § 2(g) (West 2006). On appeal, Howard argued that, among other things, the charge was coercive because the jury might erroneously assume that failure to agree would result in an entirely new trial. *Id*. at 124. Howard asserted that such an assumption "pressured the jury to arrive at a verdict to avoid the time and expense of a new trial." *Id*. The court of criminal appeals disagreed, reasoning that Howard's position "would frustrate the very purpose behind a constitutionally permissive *Allen* charge." *Id*. at 125. The court explained:

> The law places upon the jury a statutory duty to deliberate and answer the special punishment issues. An *Allen* charge is designed to foster or "coerce" this debate and to circumvent a mistrial. Texas law should not be construed to favor a mistrial by informing the jury, via an *Allen* charge, that the trial court will "take over" and impose a life sentence as soon as deliberations become difficult. Such an instruction would effectively negate the "coercive" nature of an *Allen* charge and encourage jurors to discontinue deliberation, contradicting the thrust of the supplemental charge.

*Id*. (internal citations omitted).

18

Although *Howard* was a capital case, we believe the reasoning in *Howard* is also applicable to non-capital cases such as this one.[7] Whether the result of jury deadlock is the automatic imposition of a life sentence or a new trial on punishment, the failure of a jury to reach agreement on a verdict is not a favored outcome. As the Supreme Court explained in *Allen*:

> While, undoubtedly, the verdict of the jury should represent the opinion of each individual juror, it by no means follows that opinions may not be changed by conference in the juryroom. The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves. It certainly cannot be the law that each juror should not listen with deference to the arguments and with a distrust of his own judgment, if he finds a large majority of the jury taking a different view of the case from what he does himself. It cannot be that each juror should go to the jury-room with a blind determination that the verdict shall represent his opinion of the case at that moment; or, that he should close his ears to the arguments of men who are equally honest and intelligent as himself.

*Allen*, 164 U.S. at 501; *see also Lowenfield*, 484 U.S. at 237 ("The continuing validity of this Court's observations in *Allen* are beyond dispute. . . ."). Thus, the purpose of an *Allen* charge is to encourage further deliberation and prevent a mistrial. *See Howard*, 941 S.W.2d at 125. Including language in the charge to the effect that a mistrial would be "as to punishment only," particularly after deliberations have become difficult, could "effectively negate the 'coercive' nature of an *Allen* charge and encourage jurors to discontinue deliberation, contradicting the thrust of the supplemental charge." *See id.*; *see also Hairston v. State*, No. 14-04-01016-CR, 2006 Tex. App. LEXIS 3135,

---

[7] In capital cases, the failure of the jury to agree on the special punishment issues would result in the imposition of a life sentence by the trial court, not a new trial on punishment. *See* Tex. Code Crim. Proc. Ann. art. 37.071, § 2(g) (West 2006). On the other hand, in non-capital cases, if the jury fails to agree on the issue of punishment, that jury shall be discharged, and the trial court "shall impanel another jury as soon as practicable to determine the issue of punishment." *See id.* art. 37.07, § 3(c) (West Supp. 2008).

at *8 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd) (mem. op., not designated for publication) (rejecting defendant's argument that similarly worded *Allen* charge misled jury into believing that "the entire case may or may not be retried."). Accordingly, we conclude that the district court did not err in declining to include such language in the charge.[8]

Because we conclude that the district court did not err, we need not address Deaton's contention that, due to the application of rule 606(b), he was prevented from showing that the error was harmful. *See* Tex. R. Evid. 606(b). We overrule Deaton's second issue.

## CONCLUSION

We affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Justices Patterson, Pemberton and Waldrop

Affirmed

Filed: June 26, 2009

Do Not Publish

_____

[8] The only case cited by Deaton in which an *Allen* charge given during punishment included language that a mistrial would be declared "on punishment only" is *Lopez v. State*, No. 13-05-759-CR, 2006 Tex. App. LEXIS 7510, at *3-6 (Tex. App.—Corpus Christi 2006, no pet.) (mem. op., not designated for publication). However, the appeals court did not address the issue of whether omitting such language would be error. Rather, the appeals court simply held, without much explanation or analysis, that the *Allen* charge in that case was not coercive. *See id*. at *5-6. We find *Lopez* neither helpful nor persuasive here.